**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID GLOVER | : | PRISONER |
| *Plaintiff* | : | CIVIL NO. 3:02CV1953(AVC)(TPS) |
| | : | |
| V. | : | |
| | : | |
| DEPARTMENT OF CORRECTION, DR. | : | |
| BIRKOWITZ, DR. WEINE, DR. | : | |
| THANKAPPAN, AND DR. BOGDANOFF | : | |
| *Defendants* | : | SEPTEMBER 19, 2005 |

## THE DEFENDANTS LOCAL RULE 56(c) STATEMENT OF UNDISPUTED FACTS

Pursuant to Rule 56(c) of the Local Rules of Civil Procedure, the defendants file this statement of undisputed material facts in support of their Motion for Summary Judgment.

1. At all times which gave rise to his claims, the plaintiff was a convicted and sentenced inmate in the custody of the Connecticut Department of Correction. Exhibit A[1], complaint form page 1.

2. The plaintiff was convicted after trial in 1993. Exhibit A, pg. 1. On August 23, 1993, the plaintiff received an injection of Haldol medication, because he had purposefully burned himself. Exhibit A, pg. 2. On November 24, 1993, the plaintiff signed a document consenting to his treatment with anti-psychotic medication, including Haldol. Exhibit A, pg. 2; A(1)[2].

---

[1] Exhibit A: Plaintiff's Complaint.
[2] Exhibit A(1): Photocopy of Mental Health Services Consent for Treatment with Anti-Psychotic Drugs form signed by the plaintiff on November 24, 1993, and attached to his Complaint as an exhibit.

3. On April 17, 1996, the plaintiff reported that he was doing fine, that he was working on an appeal of his case, and on April 30, 1996, he discussed his upcoming pardon and appeal in federal court. Exhibit B[3], pg. 1.

4. On July 1, 1996, the plaintiff reported that he had an appointment with the law library for help in filing out habeas corpus forms for an appeal, as he didn't understand legal language. Then on July 24, 1996, he reported that the law library was able to help with the forms that he didn't understand and he was now just waiting to have them notarized and copied. Exhibit B, pg. 3.

5. On August 14, 1996, the plaintiff reported that he had sent his appeal in, but didn't expect it to work, and on September 10, 1996, reported that he was "baffled" by the appeal process, and was giving up on the pardon board. Exhibit B, pgs. 4, 5.

6. On October 11, 1996, the plaintiff reported that his public defender attempted to visit, but got tired of waiting and left, but the plaintiff was still hopeful for an appeal as this was his second murder conviction. The record noted that he was alert and oriented. Exhibit B, pg. 6.

7. On November 20, 1996, the plaintiff reported that he had submitted the paperwork for a pardon and that he had seen his public defender for an appeal. Exhibit A, pg. 1; Exhibit B, pg. 7.

8. On January 6, 1997, the record notes that the plaintiff's medications were reviewed and renewed: no adverse reactions from medications noted at that time and the plaintiff had no physical or emotional concerns. The plaintiff reported that he was still awaiting a response from his appeal and his application to the pardon board and that he continued to send virtually all of his money earned as a tier man home to help support his daughter. On January

---

[3] Exhibit B: Relevant pages of the Certified Connecticut Department of Correction Clinical

25, 1997, the record noted that the plaintiff was med compliant and continued to work as a tier man.  Exhibit B, pgs. 8, 9.

      9.      On June 24, 1997, the plaintiff reported that his appeal had been denied and that he was still working.  Exhibit B, pg. 12.  His attorney Michael Moskowitz sent him the results of the Appellate Court's decision on the appeal.  Exhibit A, pg. 1.

      10.      On August 13, 1997, the plaintiff signed a consent form to placed on the Mental Health Transitional Unit and to abide by its rules, including (A) following the treatment plan, and (D) to follow the medication program as prescribed.  Exhibit C[4].

      11.      On October 28, 1997, the plaintiff was still talking about his appeal, but was not sure how to go about it. Exhibit B, pg. 13.

      12.      On November 23, 1997, the plaintiff refused recommended dental services and signed and dated a refusal form.  Exhibit B, pg. 14.'

      13.      On May 5, 1998, Dr. Arthur W. Davies wrote to the plaintiff's attorney, Ms. Vicki Hutchinson, in response to her request for a medical opinion regarding the mental effect of the medications the plaintiff was being treated with at the time.  His letter states that after extensively reviewing the records Attorney Hutchinson provided him, his opinion was that "it would be highly unlikely that the medications he was receiving at the time impeded or altered his thought processes in any negative manner.  What the record does indicate however, is precisely the opposite.  Such symptoms as self mutilation and nonverbal behavior resolved and Mr. Glover was competent while medicated."  Exhibit D[5]

---

Record for the plaintiff, dated April 17, 1996 through March 26, 2005.
[4]  Exhibit C:  Certified Connecticut Department of Correction Contract for Mental Health Transitional Unit signed by the plaintiff on August 13, 1997.
[5]  Exhibit D:  Medical opinion letter of Dr. Arthur W. Davies, to plaintiff's attorney Ms. Vicki Hutchinson, dated May 5, 1998.

14. On May 21, 1998, the plaintiff requested to see the doctor because the previous psychiatrist told him that he was going to be taken off medication. He reported that the medication is making him too tired, but that he was doing good and getting along with everyone in the unit. The plaintiff also reported that he went to court that month and his case was looking favorable and believed that his sentence would get reduced. Exhibit B, pg. 15.

15. On August 14, 1998, the plaintiff signed a form of Consent for Treatment with Psychoactive Medication, which was Zyprexa. Exhibit E[6].

16. On August 21, 1998, the plaintiff reported feeling much better on the new medication, that he didn't feel as sleepy as before. And on October 21, 1998, he stated that the new medication Zyprexa was a good choice, that he was able to now, attend AA meetings and work at his job on the unit. Exhibit B, pg. 17.

17. On September 10, 1998, the State of Connecticut Appellate Court sent an Overdue Brief Notice to attorney Vicki Hutchinson, the plaintiff's attorney of record on his appeal, informing her that no brief had been filed on Mr. Glover's behalf and was now overdue and subject to dismissal. Exhibit F[7].

18. On September 16, 1998, the plaintiff filed a handwritten request for an extension of time to file his appellate brief in the Connecticut Office of the Clerk for the Superior Court, G.A. 3.. Exhibit G[8].

19. On September 18, 1998, the State of Connecticut Office of Appeals wrote to Attorney Hutchinson and enclosed the plaintiff's handwritten request for an extension of time.

---

[6] Exhibit E: Certified Connecticut Department of Correction Form of Consent For Treatment With Psychoactive Medication, signed by the plaintiff on August 14, 1998.
[7] Exhibit F: Overdue Brief Notice from the State of Connecticut Appellate Court, dated September 10, 1998.
[8] Exhibit G: Plaintiff's handwritten request for additional time to file his appellate brief.

The court reminded Ms. Hutchinson that she was the attorney of record for the plaintiff and thus his request was returned because he did not have an appearance in the appeal and the request was not filed in proper form. The court also reminded her of the recently sent overdue brief notice and directed her to respond to her client's concerns regarding the overdue brief. A copy of the letter was cc'd to the plaintiff, Donald Glover. Exhibit H[9].

20. In September, 1998, Ms. Vicky Hutchinson, an attorney acting on behalf of the plaintiff, filed an appellate brief for the plaintiff in the case of *Glover v. Commissioner of Correction*. Exhibit F.

21. On March 29, April 22, May 7 & 9, and June 6, 1999, the plaintiff reported that he continued to maintain his job on the unit, had no problems, complaints or side affects other than some sleep problems, and was compliant with his medications. Exhibit B, pg. 19.

22. On September 9, 1999, the plaintiff reported that he took himself off his medications for several weeks in the past month, but had decided on his own to start taking them again. The plaintiff asked the psychiatrist if he could get off his medication altogether, but the psychiatrist strongly suggested that he remain on the medication. Exhibit B, pg. 21.

23. On October 12, 1999, the plaintiff reported taking his medications again even though he didn't want to, because when he was off the medication, he believed his thinking process sped up. He started to think in more detail and felt as if he had been in a stupor since 1993 but was out of that now. On October 12, 1999, the plaintiff reported an increasing sense of depression about his loss of contact with his daughter and length of incarceration. Exhibit B, pg. 22.

---

[9] Exhibit H: September 18, 1998 letter to Ms. Hutchinson, plaintiff's attorney of record on his appeal, regarding the plaintiff's handwritten request for an extension of time.

24. On August 4, 2000, the plaintiff reported that he received a letter from Family in Crisis informing him that they could not locate an agency that could locate his daughter, so he would ask his brother to assist him in doing so. On September 12, 2000, he was still focused on the search for his daughter and reported that he was planning to sue Whiting for records, but was instructed to write for the medical records for this. Exhibit B. pg. 23.

25. On November 2, 2000, the plaintiff was transferred to Osborn Correctional Institution. Exhibit B, pg. 24.

26. On November 21, 2000, the plaintiff had delusions that if he burned scars on his genitals, the scars will go away. He was continued on his current medications. On December 19, 2000, the plaintiff reported a desire to come off his medications, but remained delusional about his desire to burn his flesh to heal his scars. Exhibit B, pg. 25.

27. On January 16, 2001, the plaintiff remained potentially dangerous to himself due to delusions about burning himself. Exhibit B, pg. 26.

28. On May 7, 2001, the plaintiff's thoughts were reported to be well organized and future oriented. Exhibit B, pg. 30.

29. On June 15, 2001, the plaintiff reported awaiting word from the courts about his appeal and discussed his desire to take college classes in the fall. Exhibit B, pg. 30.

30. On July 5, 2001, the plaintiff was determined to understand and be fully aware of the risks of refusing his medications, and on July 9, 2001, asked how long the transition period would be when they would observed him now that he had stopped his medications. The plaintiff also stated that the Prozac had made him silly; that is, it made him hear silly songs in his head, but he also reported an insatiable desire to read. Exhibit B, pgs. 31, 32.

31. On July 23, 2001, the plaintiff reported that his biggest concern at that time was about his appeal, but that his appetite for reading was still strong . He was fixated on the idea that he was improperly charged with assault which added ten years to his sentence. And on August 6, 2001, the plaintiff reported no changes since he discontinued his medications, other than a loss of motivation regarding his appeal. Exhibit B, pg. 34.

32. On August 8, 2001, the plaintiff reported that he'd been reading a lot, but he had not been to the law library in two weeks. Exhibit B, pgs. 32, 33.

33. On August 30, 2001, the plaintiff's mental status had not significantly changed since the discontinuation of his medication. He had mild obsessive traits, some sleep disturbances and increased stress related to his appeal, but overall he was in good behavioral control with no self harming behavior. Exhibit B, pg. 35.

34. On August 31, 2001, the plaintiff reported that he intended to make the case that pretrial doses of haldol rendered him incompetent to stand trial and therefore was unjustly sentenced to more time than he believes he deserves. And on September 17, 2001, the plaintiff reported that he was good, that he felt like he was on vacation, so to speak, since sending out some court paperwork. Exhibit B, pg. 36.

35. On October 25, 2001, the plaintiff reported that he really wanted to talk about his court case. The plaintiff was alert and oriented. He expressed frustration and feelings of increased stress related to his efforts to reopen his case and felt at a dead end with a worker at the law library and fears of speaking to his supervisor. Exhibit B, pg. 37.

36. On October 25, 2001, the plaintiff reported continued stress over his legal matters. On November 21, 2001, the plaintiff again reported that his primary focus was on his case, and

that he continued to experience stress while waiting for a reply from the Civil Liberties organization. Exhibit B, pg. 38.

    37.    On December 6, 2001, the plaintiff reported that he had just gotten back from the library where he continued to work on his legal case and was somewhat pre-occupied. The Civil Liberties organization responded to his letters but were unable to provide assistance. The plaintiff stated that he intended to pursue a habeas corpus, speak to the law library supervisor, and ask assistance of Legal Aid there at Osborn C.I.. The plaintiff's thinking was reported to be logical and well organized. On January 8, 2001, the plaintiff discussed his frustrations regarding his court appeals and felt that he was making progress, albeit slowly. Exhibit B, pgs. 38, 39.

    38.    On February 7, 2002, the plaintiff reported that he felt at the end of his rope with respect to his effort to appeal his conviction and stated that his latest effort was a letter he wrote to the trial judge, but his frustration level was noticeably higher while he waited for a response. Exhibit B, pg. 40.

    39.    On March 19, 2001, the plaintiff reported that he was still waiting to hear from the judge about his appeals, and stated that he had ordered himself a television as a means of distracting himself from the stress related to his court appeal, and remained non-compliant with medication recommendations. Exhibit B, pg. 41.

    40.    On March 22, 2002, the plaintiff reported that he had heard about his case. He reported that he had been contacted by the Federal Public Defenders Office regarding his requests to review his findings. The letter stated that the court will review his case and if it was deemed worthy he will be visited by an attorney. The plaintiff discussed the stress of his case, even good news. Exhibit B, pg. 42.

41. On April 23, 2002, the plaintiff reported that he had completed a legal motion to the court and it had been mailed. He stated that he was contemplating working again, but wanted to keep his main focus on his legal case. Exhibit B, pg. 43..

42. On May 10, 2002, the plaintiff stated that he wanted to talk, because he had received bad news from the court – he got a letter denying his court appeal. The plaintiff reported this again on May 15, 2002 and expressed frustration and mild paranoia because it was denied without an explanation. The plaintiff stated that he is going to write and ask for the reason and also was writing to Legal Aid for assistance. The plaintiff also stated that he wrote the judge a "nasty letter" in which he had threatened to kill the judge's children in retaliation, but that he did not send the letter and instead, flushed it down the toilet. Exhibit B, pgs. 44, 45.

43. On May 30, 2002, the plaintiff's priority was to talk about his legal case. He stated that he had written two letters, one to Legal Aid and another to the court for an explanation of the reason for the denial of his appeal, and he spoke of his desire to be exonerated for part of his crime. The plaintiff also reported starting a new job. Exhibit B, pg. 45.

44. On July 2, 2002, the plaintiff reported that he got a letter stating that his appeal had been denied due to time limitations, procedures, etc. The record noted that he was clearly upset by this; his mood was angry, blaming, and he felt entitled to special consideration. Exhibit B, pg. 47.

45. On July 22, 2002, the plaintiff reported that he continued to work on his appeals and had some stress related to the cost of the legal filings, but was managing financially with his job. On August 14, 2002, he reported that he got some legal news: he had mistakenly sent his habeas to the wrong county and was informed where to send it. He also was contacted

9

by the Yale Law School about getting legal assistance and stated that he was feeling nervous, tense and agitated about his legal mail. Exhibit B, pg. 46.

46. On September 4, 2002, the plaintiff reporter that he had been contacted by legal and continued to wait for information from the court, and was still waiting on September 25, 2002. Exhibit B, pgs. 48, 49.

47. On October 16, 2002, the plaintiff reported that he had heard from the court. He was told to contact the appellate court so he put together the paperwork and sent it out. The report notes that the plaintiff gave the impression that he had been virtually sitting, waiting for a response. And on October 25, 2002, he stated that his very greatest concern was his legal appeal and he appeared to be clearly preoccupied with his legal situation. Exhibit B, pgs. 49, 50.

48. On December 17, 2003, the plaintiff reported that he had not seen a doctor in over two years, and that he had a federal lawsuit about his mental health level and how he had stopped taking them in 2001. Exhibit B, pg. 51.

49. On January 25, 2004, the plaintiff reported that the judge accepted half of his case and threw the other half out, but that was okay. He continued with his primary focus on his legal case and was only interested in discussing his case. Exhibit B, pg. 51.

         DEFENDANTS
         DR. BIRKOWITZ, ET AL

         RICHARD BLUMENTHAL
         ATTORNEY GENERAL


BY:  /s/
    Robert B. Fiske, III
    Assistant Attorney General
    Federal Bar No. ct17831
    110 Sherman Street
    Hartford, CT  06105
    Tel: (860) 808-5450
    Fax: (860) 808-5491
    e-mail: robert.fiske@po.state.ct.us


## **CERTIFICATION**

  I hereby certify that a copy of the foregoing, was mailed on this, the 20th day of September, 2005, first class postage prepaid to:

  Mr. Donald Glover, #216751
  Osborn Correctional Institution
  335 Bilton Road
  Somers, Ct 06971

         /s/
         Robert B. Fiske, III
         Assistant Attorney General